IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Joseph Krizhner[1], | ) | C/A No.: 3:12-1802-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| PurePOWER Technologies, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment case, Joseph Krizhner[1] ("Plaintiff") is suing his former employer, PurePOWER Technologies, LLC ("PPT"). He alleges the following claims in his amended complaint: (1) failure to provide a religious accommodation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); (2) retaliation related to complaints of national origin discrimination and failure to provide a religious accommodation in violation of Title VII; (3) breach of contract; and (4) violation of the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10, *et seq*. [Entry #12]. This matter comes before the court on PPT's motion for summary judgment filed February 19, 2013. [Entry #33, #34]. The motion for summary judgment having been fully briefed [Entry #35, #36, #42],[2] it is ripe for disposition.

---

[1] Plaintiff's pro se filings and Defendant spell Plaintiff's name "Kirzhner" throughout the briefing. The undersigned uses the spelling in Plaintiff's complaint and as it appears on the docket.

[2] On July 8, 2013, the court granted Plaintiff's counsel's motion to withdraw as counsel in this case. [Entry #38]. On July 11, 2013, Plaintiff filed, pro se, a supplement to his response in opposition to summary judgment. [Entry #42]. The undersigned has reviewed and considered Plaintiff's supplement in this Report and Recommendation.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district judge grant PPT's motion.

I.    Factual Background

Plaintiff is a Jewish male originally from the Ukraine in the former Soviet Union. Pl. Dep. 201:5–7 [Plaintiff's deposition may be found at Entry #33-1 or #35-1].[3] On October 26, 2010, Plaintiff was offered employment with PPT as "Senior Project Enginee –Aftertreatment Developer." [Entry #33-1 at 139]. The position was on a team of engineers in the System Optimization Department, which reported to Engineering Manager Sameer Bhargava, and worked at PPT's Columbia technical center. Pl. Dep. 76:8–77:2.

A.    Hiring Process

Before being offered employment with PPT, Plaintiff had an initial telephone interview and then an in-person interview with Bhargava and other members of the System Optimization team. Pl. Dep. 49:17–51:18.[4] Plaintiff submitted a resume in connection with his application that reflected that he had been educated in Russia and

_____

[3] The deposition citations are to the page numbers of the depositions (and not the CM/ECF page numbers).
[4] The deposition references "Mr. Pargala" instead of "Mr. Bhargava" on pages 49–51. However, this appears to be erroneous, as Pargala is not mentioned elsewhere in the deposition, and Plaintiff does not dispute that Bhargava participated in his interviews. Pl. Dep. 57:13–20.

also worked in Russia for a period of time. [Entry #33-1 at 135]. Based on his resume, what Plaintiff stated about his educational and employment history in his interview, and that Plaintiff speaks with a pronounced accent, Bhargava believed that Plaintiff was of Russian national origin. [Entry #33-4 at ¶ 8].

Following the in-person interview, PPT sent a letter on October 26, 2010, offering Plaintiff employment. *Id*. at ¶ 5. Plaintiff signed the offer letter on November 14, 2010. [Entry #33-1 at 139–140]. He thereafter asked to delay his start date more than four months, to Monday, March 21, 2011, so that he could be eligible for an early retirement bonus from his previous employer, GE Energy. Pl. Dep. 60:16–61:17. Bhargava agreed to Plaintiff's request. [Entry #33-4 at ¶ 9].

In connection with his hire, PPT offered Plaintiff relocation assistance, as he lived in Simpsonville, South Carolina–about 100 miles from PPT's Columbia facility. [Entry #33-1 at 139–140]. Prior to beginning work with PPT, Plaintiff communicated with PPT about the relocation allowance included in his job offer. In that regard, Plaintiff completed PPT's "Application" and "Voluntary Payback." [An unsigned copy may be found at Entry #33-6]. In February 2011, Plaintiff again began communicating with PPT about its offered relocation allowance. In an email to PPT's HR Manager, Nicole Quinn McGrady,[5] Plaintiff posed several specific questions about the provisions of the relocation allowance. [Entry #33-2 at 3–4]. As a result of McGrady's responses, on March 6, 2011, Plaintiff chose to receive a lump sum of $15,000 in lieu of receiving any other relocation assistance. *Id*. According to McGrady's email, the lump sum would be

---

[5] Nicole Quinn's name changed to Nicole Quinn McGrady after Plaintiff's termination.

paid in Plaintiff's first paycheck. *Id*. Plaintiff did not relocate his home from Simpsonville. Rather, he rented an apartment in Columbia, and commuted on weekends to his home in Simpsonville, where his wife continued to reside. Pl. Dep. at 64:21–25.

In his position, Plaintiff was to be responsible for the development of aftertreatment technologies to reduce emissions from PPT's diesel fuel systems. Pl. Dep. 76:21–77:6. In the ten years Plaintiff had worked at GE Energy before joining PPT, Plaintiff had no experience working on aftertreatment technologies for diesel engines. Pl. Dep. 42:6–15. Notwithstanding Plaintiff's lack of direct experience, PPT hired him for the position because of his technical background and because he expressed a willingness to learn. [Entry #33-4 at ¶ 6]. Bhargava believed that once Plaintiff learned how PPT's diesel fuel systems worked and PPT's engineering processes, Plaintiff could apply his technical knowledge to aftertreatment development. *Id*. During the in-person interview, Bhargava informed Plaintiff that he should expect to spend the first three to four months of his employment understanding PPT's engines, emissions, and calibration, and educating himself about emissions aftertreatment. *Id*. at ¶ 7.

B.    Plaintiff's Employment at PPT

When Plaintiff started work with PPT on March 21, 2011, Bhargava was in India on business, so he asked Dave Singh, a Senior Project Engineer on Bhargava's team, to give Plaintiff a tour of the technical center, introduce him to employees there, and give him a general orientation on how the team functioned. *Id*. at ¶ 10; Pl. Dep. 77:24–78:15. On Thursday, March 24, 2011, when Bhargava returned to the Columbia facility, Plaintiff met with Bhargava, Singh, and Sandeep Kumar, a Product Development Engineer on

Bhargava's System Optimization team. Pl. Dep. 80:17–82:2; Entry #33-2 at 7. During that meeting, Bhargava explained his plan for Plaintiff's initial work activities. *Id*. Bhargava told Plaintiff that he wanted him to work with Singh and Kumar for 10 to 12 weeks to get up to speed on PPT's systems, hardware, software, and current projects. *Id*. For example, PPT used INCA and Morphee software for testing its aftertreatment systems, and Plaintiff was not efficient on using those systems. Pl. Dep. 86:21-87:1. Bhargava wanted Plaintiff to assist on the team's projects, including "EGNR," which stands for exhaust, gas, noise reduction, and which relates specifically to aftertreatment of diesel engine emissions. Pl. Dep. 89:11–91:12. Bhargava outlined Plaintiff's activity plan on a white board as they discussed it. [Entry #33-2 at 7].

A week after he started, on March 28, 2011, Plaintiff attended general employee orientation training at PPT's Blythewood facility with other new PPT employees. Pl. Dep. 116:12–15. On that same day, McGrady sent an email to the employees at PPT's Blythewood and Columbia facilities introducing Plaintiff and another new employee. [Entry #33-5 at 5]. Regarding Plaintiff, the email stated: "Joseph Krizhner joined Sameer Bhargava's team as a Senior Project Engineer. Joseph has extensive experience with diesel fuel systems and has a BSME, MSME, Ph.D. in Technical Sciences, from Far East State Polytechnic University, Russia, Vladivostok-Moscow." *Id*. After introducing the second employee, the email stated: "Please welcome them to the PPT family when you see them." *Id*. Plaintiff testified that he did not feel the email was a proper introduction because it did not include that he was the Senior Project Engineer for Aftertreatment Development. Pl. Dep. 112:9–17.

5

According to PPT, shortly after Plaintiff started working at PPT, Bhargava received complaints from his team members about Plaintiff's behavior and abrasive communication style. [Entry #33-4 at ¶ 11]. For example, among the items on the activity plan was training Plaintiff on PPT's Dyno cells, which PPT uses to test engines. Pl. Dep. 98:2–8. Singh reported to Bhargava that Plaintiff made little effort to learn the testing process and that he conveyed he was superior to the technician in the lab. [Entry #33-4 at ¶ 12]. Other team members conveyed to Bhargava that Plaintiff made condescending comments about their lack of knowledge or about his superior knowledge. *Id*. at ¶ 13. In another team meeting, Plaintiff openly doubted the observations and conclusions of Kumar. Pl. Dep. at 100:5–101:25. PPT alleges that on April 13, 2011, Bhargava talked with Plaintiff about his behavior towards other team members. [Entry #33-4 at ¶ 20]. Bhargava tried to explain to Plaintiff that teamwork is very important for any company to succeed and that he had received complaints about Plaintiff's unprofessional behavior from the other team members. *Id*. According to Bhargava, Plaintiff responded adamantly that he should be leading the team's projects. *Id*.

As part of PPT's Total Performance Management ("TPM") process, Plaintiff, like all engineers on Bhargava's team, was required to complete a TPM Goal Setting Document, the purpose of which was to set his performance goals. Pl. Dep. 157:23–158:5. In Section 1, Plaintiff wrote the following in response to the question of what limited him in his job:

> [S]tarted to work recently (March 21), and need to learn details of test cells, Navistar engines technology, calibration procedures, INCA. Was not introduced to the key engineers (developers) inside and outside PPT as the

person, having the specific roles and goals in the specific projects for
"System Optimization," and currently do not have first hand contacts with
these technology owners, and that reduce [sic] my opportunities for
continiuos [sic] learning and limit put [sic] additional limits to engagement
in my current job. My goals, and participation in the projects in the capacity
of Sr. Project Engineer–Aftertreatment Developer have not been specified,
and that put an additional limits to [sic] my engagement in the current job.

[Entry #33-2 at 16].

On Friday, April 15, 2011, Plaintiff sent an email to Bhargava titled "weekly
update," in which he detailed his activities that week, and added, "[s]pecific plans for me
for the next week are not clearly defined, except to continue in a similar way, trying to
dig by myself into EGNR calculations and controls." [Entry #33-3 at 2–4]. The next day,
Saturday, April 16, 2011, Bhargava sent Plaintiff an email response, stating:

With regards to your TPM, we had many discussions last Wednesday and
also Thursday. Dave Singh introduced you to the PPT staff on March 22nd,
2011 when I was out of Office. I again introduced you to PPT engineers
and Managers last week on your repeated requests. I had requested you on
Wednesday evening to remove the sentence

[excerpt from Plaintiff's TPM quoted above]

But you refused to do so. Since you are adamant for this I will approve your
TPM as it is.

During our March 24th (attached in this email) meeting your activities were
clearly defined as to work with Sandeep Kumar and Dave Singh and come
up to speed with

      i) 11L engine performance/emissions/AFR-ENGR/Bosch-FIS;
      j) INCA Calibration
      k) DYNO Cells and Technicians
      b) Help with the 11L Virtual Calibration

Not sure why you are saying that your activities for the next week are not
clearly defined.

*Id*. On Monday, April 19, 2011, at 8:40 a.m., Plaintiff sent the following email reply to

Bhargava:

> I have not removed the sentence (about limited [sic] to my job engagement in the TPM) because I was not introduced as Sr. Project Engineer – AFTERTREATMENT DEVELOPER (the position, I was hired for).
>
> Your tasks for me (as you underlined them on March 24, and in your e-mail below) also do not include my AFTERTREATMENT DEVELOPMENT activity.
>
> You have changed my work engagement, responsibilities and the position, deviating far from the role of the leading AFTERTREATMENT DEVELOPER even before I started to work at PPT. For example, on my first day at PPT, and later on, I have not been introduced as the AFTERTREATMENT DEVELOPER.
>
> As I mentioned, I will be happy to support you for other than aftertreatment projects, but the task to "come up to speed" with the items, described in your email below has very little to do with my current job title, and responsibilities, as it was advertised in the position description.
>
> TPM asked for my opinion – what are the main limitations to my work engagement, and the sentence in the red font, which you quoted below, does reflect my opinion in the subject.

*Id*. (emphasis in original)).

Bhargava viewed Plaintiff's communication as defiant, untruthful as far as his

introductions to employees, and conveying an unwillingness to cooperate with him and

his team. [Entry #33-4 at ¶ 21]. Plaintiff testified at his deposition that Bhargava had

limited him by not introducing him as the leader of aftertreatment development (Pl. Dep.

175:12–20), but also admitted himself in his deposition that he was not ready to lead that

work (Pl. Dep. 175:7–11). He further admitted that he needed training to perform PPT's

aftertreatment work. Pl. Dep. 90:24–92:7.

After receiving Plaintiff's April 18, 2011 email, Bhargava consulted McGrady. [Entry #33-4 at ¶ 22]. Bhargava conveyed his belief that Plaintiff had a poor attitude about his work and the training he needed to perform it, that he was not a team player, and that his conduct was destroying Bhargava's team's spirit. *Id*. Bhargava gave McGrady examples of Plaintiff's alleged comments and other uncooperative conduct, told her of his attempt to counsel Plaintiff on April 13, 2011, and provided her a copy of his April 15–18, 2011, email communication with Plaintiff. *Id*.

The following day, April 19, 2011, McGrady interviewed some of Bhargava's team members in Columbia to obtain their perspective. [Entry #33-5 at ¶ 5]. According to McGrady's handwritten notes taken during these interviews, the team members echoed Bhargava's complaints. [Entry #33-5 at 2–3, 6–11]. Singh reported, among other things, that Plaintiff did not discuss the status of projects with the team, did not pay attention in team meetings, made comments that he "knew everything" and they "did not know anything," and that as he had previously informed Bhargava, Plaintiff made little effort to understand the Dyno cell testing process and questioned why he had to observe how PPT obtained test data. *Id*. Singh also conveyed his belief that Plaintiff's attitude would reduce the team's motivation, productivity, and cohesiveness. *Id*. Steve Coghill, a Project Engineer on the team, reported that Plaintiff had withdrawn from the team, was not communicating about projects, and expressed disagreement in meetings. *Id*. Alus Kunwar, a Product Development Engineer, reported that Plaintiff challenged everyone, that he was not a team player, and that he did not communicate with the team. *Id*. With respect to a project Kunwar had been working on for six months, Plaintiff told him his

proposal was just a "random idea," which Kunwar found offensive. *Id*. Kumar reported that Plaintiff made "scoffing remarks" in response to Kumar's answers to his questions and made him feel like he did not know anything. *Id*.

Following these interviews, Bhargava and McGrady discussed with her boss, Lou Herrera, and his boss, Chief Engineer Steffen Martin, the negative effect they felt that Plaintiff's conduct was having on the System Optimization team and Bhargava's unsuccessful attempt to counsel him on April 13, 2011. [Entry #33-4 at ¶ 23–24]. Bhargava and McGrady then decided to terminate Plaintiff's employment for his poor attitude, unwillingness to communicate productively and constructively with the team, and insubordination toward Bhargava. *Id*. Bhargava and McGrady notified Plaintiff of the termination decision later that day, ending his employment on April 19, 2011, less than a month after he started working for PPT. *Id*. at ¶ 25.

C.     Plaintiff's Allegations Regarding Discrimination and Retaliation

Plaintiff's amended complaint alleges that PPT failed to provide him with a religious accommodation. [Entry #12].  He also alleges PPT retaliated against him based on his complaints of failure to provide a religious accommodation and national origin discrimination. *Id*.

Plaintiff is Jewish and testified that he observes Shabbat at sunset on Fridays, which he described as follows:  "To me means that I would like, if it's possible, to go and to meet at, you know, someplace where I can give some simple, modest prayer – and me and my wife and daughter. If it's not possible, I just make that in my mind." Pl. Dep. 191:16–24. Plaintiff testified that on one of the four Fridays that he worked for PPT,

10

Bhargava asked him to attend a meeting after seven on a Friday. Pl. Dep. 210:20–212:5. He testified that he told Bhargava "that I needed to be at sunset at home. And I desire that I be with my family in Simpsonville, as sometimes I can do it here [Columbia], but I would rather go drive and be there before sunset." Pl. Dep. 211:21–24. Bhargava told Plaintiff he needed to stay for the meeting. Pl. Dep. 212:1–5.

Plaintiff also testified that Bhargava mentioned his preference for using Indian employees with Indian customers in a team meeting. In the meeting, Bhargava explained his reasoning for assigning Indian employees to projects for Indian customers by saying that "When you go to help business with aliens to another planet, or when they come in to you, then to have your enterprise to be successful, you should have this job done by this same aliens or somebody who are from them and who has their culture." Pl. Dep. 180:10–15.  Additionally, Plaintiff testified that Bhargava sometimes stated that India was a great country and that only the white people prevented it from developing. Pl. Dep. at 182:25–183:16. Plaintiff also testified that Bhargava implied on several occasions that he assigned Indian employees to projects because they were better for business. Pl. Dep. at 188:13–16.

Plaintiff alleges that he complained to McGrady on March 28, 2011, one week after he began work at PPT, that Bhargava had not given him aftertreatment assignments and did not want him to leave early enough "to be able to have the Friday sunset" in Simpsonville.[6] Pl. Dep. 213:9–17. Plaintiff testified that he complained about

---

[6] Although Plaintiff could not remember which of the four Fridays that Bhargava made him stay past sunset, given Plaintiff's allegation that he complained to McGrady of the

discrimination to McGrady on another occasion, but he did not provide any details of what he conveyed to her. Pl. Dep. 214:4–216:17.

II.    Discussion

A.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non–movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

B.    Analysis

1.    Subject Matter Jurisdiction

It is axiomatic that a court must be satisfied of its own subject matter jurisdiction before proceeding. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *Pinkley,*

---

discrimination on March 28, 2011, the only possible inference is that the meeting was held on March 25, 2011, which was the first Friday Plaintiff worked.

*Inc. v. City of Fredrick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). It is also well-settled that the "failure to file a complaint with the EEOC in a timely manner deprives [the court] of subject-matter jurisdiction over the claim." *Dolgaleva v. Virginia Beach City Public Schools*, 364 Fed. Appx. 820, 824 (4th Cir. 2010). The Fourth Circuit has "long held that receipt of, or at least entitlement to, a right-to-sue letter is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint." *Davis v. N.C. Dept. of Corrections*, 48 F.3d 134, 140 (4th Cir. 1995). Hence, where the complaint does not allege that a plaintiff has complied with Title VII's prerequisites, "the plaintiff has not 'properly invoked the court's jurisdiction under Title VII.'" *Id.* (quoting *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979)).

In this case, the amended complaint states that Plaintiff is invoking the jurisdiction of the court under various statutes, including 42 U.S.C. § 2000e. [Entry #12 at ¶ 4]. However, the complaint is not clear whether Plaintiff has complied with Title VII's prerequisites. Therefore, the undersigned recommends this matter be dismissed for lack of subject matter jurisdiction if Plaintiff does not show that he has complied with Title VII's exhaustion requirements within the time for filing objections to this Report.

2.     Failure to Provide Religious Accommodation Claim

It appears that Plaintiff has abandoned his claim of failure to make a religious accommodation, as he has not addressed it in his response brief. *See* Fed. R. Civ. P. 56(c), (e)(2); *see also Coker v. International Paper Co.*, No. 08-1865, 2010 WL 1072643 at * 2 (D.S.C. Mar.18, 2010) ("[A] plaintiff can abandon claims by failing to address them in response to a summary judgment motion."); *Jones v. Danek Medical, Inc.*, No.

96–3323, 1999 WL 1133272, at * 3 (D.S.C. Oct. 12, 1999) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."). Therefore, the undersigned recommends PPT be granted summary judgment on Plaintiff's claim of failure to make a religious accommodation.

### 3.     Retaliation

Title VII forbids employers from retaliating against their employees for exercising their rights under the statutes, which are considered "protected activities." 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d).  "Protected activities fall into two distinct categories: participation or opposition . . . . An employer may not retaliate against an employee [for] participating in an ongoing investigation or proceeding . . . nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse action. *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). Plaintiff claims that he engaged in protected activity when he complained to McCrady on two occasions.

The Fourth Circuit has "held that opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). The Fourth Circuit balances

the purpose of anti-retaliation statutes against "Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Laughlin*, 149 F.3d at 259 (internal quotation marks omitted). Accordingly, anti-retaliation laws do not "protect employees who, with no more than good faith, complain about conduct that no reasonable person would believe amounts to an unlawful employment practice." *Jordan*, 458 F.3d at 342. Instead, the employee's belief that the conduct of which he complains actually violates the statute in question must be an objectively reasonable one, and whether the employee's belief is reasonable is a question of law for the court. *Id*. at 339.

        a.      Retaliation for complaining of failure to make religious accommodation

Plaintiff testified that he first complained to McGrady on March 28, 2011, that, in the week since he had started, he had not received any aftertreatment projects and that Bhargava had not allowed him to leave work in time for him to be in Simpsonville by sunset on one Friday. PPT argues that Plaintiff could not have reasonably believed he was complaining about an unlawful employment practice. [Entry #34 at 20–21]. Specifically, PPT argues that because Plaintiff never told Bhargava (1) that he was Jewish or (2) that, for religious reasons, he wished to be home by sunset on Fridays, he could not have reasonably believed that Bhargava's requiring him to stay past 7:00 p.m. on Friday violated the law.

Here, the record is unclear whether Plaintiff informed Bhargava that his desire to be home by sunset on Fridays was based on his religion, and therefore could be

considered a request to accommodate. For instance, Plaintiff testified as follows during

his deposition:

> Q.    Did you ever discuss your national origin with anyone at PPT?
> A.    I did.
> Q.    With who?
> A.    I did discuss it with Steve and David Singh and with Sameer.
> Q.    And what did you discuss with Dave, Singh, Steve Coghill and Sameer about your national origin?
> A.    The fact that I am Jewish. And that I'm Jewish by origin. And that I have this – I would not say "obligations" – but I have this inspiration to remember on Shabbat who gave it.

Pl. Dep. 201:8–19. However, when asked elsewhere in his deposition with whom he had

discussed his Jewish religion, Plaintiff testified as follows:

> Q.    With whom did you discuss it?
> A.    With the same–it was the same ones, when I gave you in the previous question. It was Steve, Singh, and somebody else.
> Q.    You don't recall any discussion with anyone else at PPT about –
> A.    I do not.

Pl. Dep. 200:19–25. Viewing the evidence in the light most favorable to Plaintiff as the

non-moving party,[7] the undersigned assumes for purposes of Plaintiff's prima facie case

that he engaged in a protected activity when he complained to McGrady on March 28,

2011, about an alleged failure to make a religious accommodation.

PPT appears to concede that Plaintiff suffered an adverse employment action.

However, PPT argues that Plaintiff has not shown that there was a causal connection

---

[7] The undersigned recognizes that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts. *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1991). However, because Plaintiff's testimony does not directly contradict itself because he refers to "somebody else" and because neither party tried to clarify the testimony during the deposition, under the circumstances presented in this case, the undersigned views the evidence in the light most favorable to Plaintiff.

between the protected activity and his termination. [Entry #34 at 22–23]. Plaintiff argues, and the undersigned agrees, that the close temporal proximity between the protected activity and his termination, although far from conclusive, is sufficient to show causation for purposes of his prima facie case. *Jones v. City of Elizabeth City, North Carolina*, 840 F.Supp. 398, 403 (E.D.N.C.1996), *aff'd.*, 2 F.3d 1149 (4th Cir. 1993).

Assuming Plaintiff can establish a prima facie case of retaliation, the burden shifts to PPT to show a legitimate, non-retaliatory reason for terminating him. *Laughlin*, 149 F.3d at 258. "Once the defendant produces evidence of its legitimate non[retaliatory] reason for the adverse employment action, the presumption of discrimination created by the prima facie case is rebutted and 'drops from the case, and [the plaintiff] bears the ultimate burden of proving that she has been the victim of retaliation." *Id.* (internal citations omitted). The plaintiff can meet this burden by producing evidence that would allow a fact finder to conclude that the employer's stated legitimate and non-retaliatory reasons "are merely pretext for discrimination or retaliation." *Darvishian v. Green*, No 08–1672, 2010 U.S. App. LEXIS 25601, at *15 (4th Cir. Dec. 14, 2010). "In practice, . . . the 'pretext' inquiry merges with the plaintiff's ultimate burden to prove that he or she was the victim of intentional discrimination or retaliation." *Id.* at *16.

PPT argues that Plaintiff was terminated because his poor, uncooperative attitude inhibited Bhargava's team. [Entry #34 at 23]. Bhargava submitted an affidavit listing incidents in which he or other team members found Plaintiff's comments to be condescending or unprofessional. [Entry #33-4 at ¶¶ 11–19]. Bhargava avers that as a result of Plaintiff's comments, his team members were being less expressive in team

meetings. *Id.* at ¶ 18. Additionally, when Bhargava consulted McGrady about the problems with Plaintiff, she interviewed Plaintiff's team members who confirmed Bhargava's complaints. [Entry #33-5]. The undersigned finds PPT has met its burden of producing a legitimate, non-discriminatory reason for terminating Plaintiff.

Plaintiff has set forth no evidence that PPT's proffered reason was a pretext for retaliatory animus based on his complaint to McGrady about not receiving a religious accommodation. Plaintiff relies exclusively on temporal proximity, which is insufficient for a reasonable juror to conclude that Plaintiff has met his ultimate burden of showing intentional retaliation. Therefore, PPT is entitled to summary judgment based on Plaintiff's claim for retaliation related to PPT's alleged failure to provide him a religious accommodation.

b.     Retaliation related to national origin discrimination

Plaintiff has not shown that he engaged in a protected activity related to his national origin. Plaintiff testified that he complained to McGrady that Bhargava had not assigned him any aftertreatment projects. However, Plaintiff has pointed to no testimony or evidence showing that he complained that, based on his national origin, Bhargava had discriminated against him or refused to assign him aftertreatment projects.[8] Therefore, Plaintiff could not have objectively believed that his complaints about Bhargava's refusal to assign him aftertreatment projects constituted a complaint of unlawful behavior. *See,*

---

[8]   Plaintiff's supplement to his response brief is replete with allegations that Defendant only hired Indians or gave greater assignments to Indians with less experience. [Entry #42].  However, Plaintiff has alleged only a claim of retaliation based on a complaint of national origin discrimination and has not alleged a claim based on alleged disparate treatment.

*e.g., Christy v. City of Myrtle Beach*, C/A No. 4:09-1428-JMC, 2012 WL 2149780, *5 (D.S.C. June 13, 2012) (finding that Plaintiff had not engaged in a protected activity because her complaints about reporting to another officer had not mentioned gender); *Middleton v. Motley Rice, LLC*, C/A No. 2:08-3256-CWH, 2010 WL 3167360, *7 (D.S.C. Aug. 9, 2010) (finding that Plaintiff did not engage in a protected activity because he admitted he had only complained about his salary, but had not referenced his race); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (in an ADEA case, "a general complaint of unfair treatment does not translate into a charge of illegal age discrimination"); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference is insufficient.").

Because Plaintiff has failed to prove an essential element of his prima facie case, the undersigned recommends PPT be granted summary judgment on Plaintiff's retaliation claim related to his national origin.

### 4.    Breach of Contract Claim

Plaintiff alleges PPT breached a contractual obligation to him when it refused to pay him the relocation fee. However, Plaintiff has not identified a valid contract PPT allegedly breached. Although Plaintiff notes that his offer letter discusses the relocation policy, Plaintiff fails to acknowledge that the offer letter also states: "Nothing contained in this offer of employment, or any other materials provided to you in connection with your employment shall be construed as a contract . . . ." [Entry #33-1 at 139–140].

Although Plaintiff also argues that he signed the Relocation Policy, the record does not contain a signed copy. [Entry #33-6]. Finally, while under South Carolina law, "there exists in every contract an implied covenant of good faith and fair dealing." *Tharpe v. G.E. Moore Co.*, 174 S.E.2d 397, 399 (S.C. 1970), the South Carolina Court of Appeals has ruled that the covenant does not give rise to an independent cause of action. *Rotec Servs. v. Encompass Servs.*, 597 S.E.2d 881, 884 (S.C. Ct. App. 2004). Rather, the covenant is "merely another term of the contract at issue." *Id*. at 472. Therefore, because Plaintiff cannot establish that PPT was contractually obligated to pay him relocation fee, the undersigned recommends PPT be granted summary judgment on Plaintiff breach of contract claim.

### 5.    Payment of Wages Act Claim

Plaintiff also claims that he is entitled to the $15,000 relocation pay under the South Carolina Payment of Wages Act ("SCWPA"). The undersigned disagrees. First, the SCPWA does not contemplate any recovery without an underlying contractual right to the amount in question. *Dumas v. Infosafe Corp.*, 463 S.E.2d 641, 645, n.4 (S.C. Ct. App. 1995).  Because Plaintiff cannot point to any contractual right to relocation pay, he cannot maintain a SCWPA claim. Second, relocation expenses are not recoverable wages under the SCPWA. The SCPWA defines "wages" as follows:

> all amounts at which labor rendered is recompensed, whether the amount is
> fixed or ascertained on a time, task, piece, or commission basis, or other
> method of calculating the amount and includes vacation, holiday, and sick
> leave payments which are due to an employee under any employer policy
> or employment contract. Funds placed in pension plans or profit sharing
> plans are not wages subject to this chapter.

S.C. Code Ann. § 41-10-10(2). Because a payment to cover relocation expenses is not recompense for actual labor performed, it does not satisfy the plain language of this definition. Therefore, the undersigned recommends PPT be granted summary judgment on Plaintiff's claim pursuant to the SCPWA.

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that PPT's motion for summary judgment [Entry #33] be granted.[9]

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 24, 2013                                                 Shiva V. Hodges
Columbia, South Carolina                                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

[9] Plaintiff's motion to compel [Entry #43], filed on July 22, 2013, over five months after Defendant filed its summary judgment motion, is denied as untimely, as the discovery deadline expired on January 28, 2013 [Entry #30]. A cursory review of the motion also reveals that Plaintiff seeks discovery related to alleged disparate treatment, which claim was not alleged in his amended complaint [Entry #12]. Additionally, Plaintiff's motion for a hearing [Entry #44] is also denied.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).