IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Joseph Krizhner, | ) | |
| | ) | C/A No. 3:12-1802-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| PurePOWER Technologies, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On June 29, 2012, Plaintiff Joseph Krizhner,[1] who is originally from the Ukraine in the former Soviet Union and Jewish, brought the within action against his former employer, Defendant PurePOWER Technologies, LLC.  Plaintiff filed an amended complaint on August 2, 2012.  In his amended complaint, Plaintiff asserts causes of action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.  Specifically, Plaintiff asserts that he was denied an accommodation for his religious beliefs, not given assignments or treated in accordance with his job title because of his religion, and retaliated against when he complained about these allegedly discriminatory practices (First Cause of Action).  Plaintiff also alleges that he was retaliated against for complaining about not being assigned to projects because of his national origin (Second Cause of Action).

Plaintiff also asserts state law claims.  Plaintiff contends that Defendant withheld payment of a $15,000.00 relocation allowance, in breach of the parties' employment agreement (Third Cause of Action) and in violation of the South Carolina Wage Payment Act (Fourth Cause of Action).  In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United

---

[1] Plaintiff also is denominated as "Joseph Kirzhner" in various filings.

States Magistrate Judge Shiva V. Hodges for pretrial handling.

On February 19, 2013, Defendant filed a motion for summary judgment as to all causes of action. Plaintiff filed a response in opposition on March 5, 2013, to which Defendant filed a reply on March 15, 2013. On July 8, 2013, counsel for Plaintiff filed a motion to withdraw as attorney, which motion was granted on July 8, 2013. Plaintiff thereafter has proceeded pro se. Plaintiff filed a supplement to his response to Defendant's motion for summary judgment on July 11, 2013.

On July 24, 2013, the Magistrate Judge issued a Report and Recommendation in which she determined that (1) Plaintiff had abandoned any claim of failure to make a religious accommodation, because he did not address the claim in his response to Defendant's motion; (2) Plaintiff had failed to establish that Defendant's proffered legitimate, non-retaliatory reason for terminating Plaintiff showed pretext as to Plaintiff's religion; and (3) Plaintiff failed to make out a prima facie case that he was retaliated against because of his national origin. The Magistrate Judge further determined that Plaintiff (1) did not establish that Defendant was contractually obligated to pay him a relocation allowance, and (2) the relocation allowance did not constitute "wages" so as to be encompassed within the South Carolina Payment of Wages Act. The Magistrate Judge therefore recommended that Defendant's motion for summary judgment be granted. Plaintiff filed objections to the Report and Recommendation on August 12, 2003, to which Defendant filed a reply on August 29, 2013. Plaintiff filed a sur-reply on September 11, 2013.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1).

This court may also receive further evidence or recommit the matter to the Magistrate Judge with

instructions. Id.

## FACTS

The facts are thoroughly discussed in the Report and Recommendation. Briefly, Defendant

is a subsidiary of Navistar, Inc., a manufacturer of International Truck vehicles ("Navistar"). See

http://www.navistar.com/navistar/global portfolio/products/trucks (Sept. 11, 2013). Defendant is

a supplier of diesel power systems, including high pressure oil pumps, oil rails, fuel injectors, fuel

and exhaust gas recirculation systems, exhaust aftertreatment systems, and various metal castings.

See http://automotiveoem.com/PurePOWER-Technologies-LLC_3693 (Sept. 11, 2013). In October

2010, Plaintiff, who holds an MSME and Ph.D. from Far East State Polytechnic University in

Vladivostok-Moscow, Russia, interviewed via telephone with Defendant's representatives for the

position of Senior Project Engineer-Aftertreatment Developer at Defendant's facility in Columbia,

South Carolina. After a telephone interview, Plaintiff was invited to travel to Columbia, South

Carolina from his home in Simpsonville, South Carolina for an in-person interview. He met with

Sameer Bhargava, Steve Coghill, and Dave Singh. Depo. of Joseph Kirzhner, 51, ECF No. 35-1.

Plaintiff conveyed to the group that he was doing development work for another company involving

combustion turbines, which included combustion, emissions, and "thinking about aftertreatment."

Id. at 52. Plaintiff conveyed that he had not worked on aftertreatment for diesel engines in the last

ten years, but that he was willing to learn the process. Id.

On October 26, 2010, Navistar issued a letter offering employment to Plaintiff (the "offer

letter"). The offer letter commenced by extending to Plaintiff the opportunity to join the Navistar

team. Letter of October 26, 2010, ECF No 35-2. The offer letter served to "confirm the details of

our offer to you for accepting the position of Senior Project Engineer-Aftertreatment Developer

reporting to Sameer Bhargava.  Our offer includes a very competitive salary and benefit plan, as well

as career opportunity and professional growth."  Navistar offered Plaintiff a base annual salary of

$95,000.00.  Regarding the proposed business relationship, the offer letter provided:

> Please be aware that your employment with Navistar will be at-will, meaning that
> either you or Navistar may terminate the relationship for any reason, with or without
> cause, and with or without advance notice.
>
> Nothing contained in this offer of employment, or in any other materials provided to
> you in connection with your employment shall be construed as a contract or promise
> of employment between you and the Company, require the Company to have "just
> cause" to terminate you, or otherwise restrict the Company's right to terminate you
> at any time or for any reason.  Statements of specific matters relating to the
> termination of employment set forth in this offer of employment or elsewhere are not
> all-inclusive and are not intended to restrict the Company's right to terminate-at-will.

Id.

Navistar further offered Plaintiff a relocation allowance to aid in the cost of his moving from

Simpsonville to Columbia:

> Relocation Provisions:
> Assuming you agree to the terms of Navistar's Relocation Policy and sign and
> execute the Voluntary Termination Authorization, Navistar will provide you with the
> financial and administrative assistance you will need to relocate to South Carolina.
> If you voluntarily terminate your employment with Navistar within the first twelve
> (12) months of your employment, you consent to and authorize Navistar to deduct the
> prorated amount of relocation expenses paid on your behalf from your wages or final
> compensation.

Id.

The offer letter directed Plaintiff's attention to an enclosed relocation policy detailing the

benefits of the program, and requesting that he execute a relocation application in addition to the

voluntary termination form.  Id.   The voluntary termination form manifested the employee's

4

understanding that if he voluntarily terminated his employment within one year of the effective date of hire, he would be required to reimburse, on a pro rata basis, Navistar's expenditures related to his relocation. Plaintiff accepted employment by signing the offer letter on November 14, 2010. Id. Plaintiff executed the relocation application and voluntary termination form on November 29, 2010. See Affidavit of Joseph Kirzhner ¶ 3, ECF. No. 35-3. Plaintiff ultimately chose to accept a lump sum relocation allowance equaling $15,000.00 after taxes. Depo. of Joseph Kirzhner 74.

Plaintiff was granted leave to remain with what was then his employer until March 14, 2011 in order to qualify for a retirement option there. Id. at 61. In March 2011, Plaintiff rented an apartment with a three month lease to allow himself and his wife time to find a home in Columbia. Id. at 64. Plaintiff commenced his employment with Defendant on March 21, 2011. Id. at 68. Plaintiff joined the Systems Optimization team of engineers managed by Bhargava. Id. at 76-77. Bhargava was not at the facility that day, so Singh, another engineer in the group, helped orient Plaintiff on his first day. Id. at 78. Bhargava thereafter met with Plaintiff on March 24, 2011 and laid out his plan as far as Plaintiff's initial work activities. Id. at 81. Bhargava informed Plaintiff that Plaintiff should work with Singh and another engineer, Sandeep Kumar, for ten to twelve weeks, and during that time frame, get up to speed on Defendant's systems, hardware, and software, and its current projects. Id. at 81-82. Defendant believed he was fully prepared and knew all the details and aftertreatment for the Navistar engine. Id. at 97.

On March 28, 2011, Nichole Quinn (now Nichole Quinn McGrady and hereinafter referred to as "McGrady"), Human Resources Manager, disseminated an email welcoming Plaintiff and another employee and introducing them to other employees at Defendant's facilities. Id. at 111. The email stated that Plaintiff had joined Bhargava's team as a Senior Project Engineer, and that he has

extensive experience with diesel fuel systems.  See Email dated March 28, 2011, ECF No. 33-5, 5.

Plaintiff took issue with the fact that the email did not mention that Plaintiff has experience with

aftertreatment testing and research, and only noted that he was hired as a Senior Project Engineer.

Depo. of Joseph Kirzhner, 112, ECF No. 35-1.

An orientation session was held on March 28, 2011, which Plaintiff attended.  Plaintiff asked

questions about Defendant's complaint procedures because he already had been discriminated

against.  Id. at 121.  According to Plaintiff, Bhargava had discriminated against Plaintiff by not

assigning Plaintiff to aftertreatment projects, but stating that he would "rather assign some Indian

people to that."  Id. at 123; see also 162-66, 185.  Plaintiff states that at a Systems Optimization team

meeting Bhargava indicated that customer interfacing would be done by persons of Indian descent.

Id. at 179.  According to Plaintiff, Bhargava told Plaintiff a number of times that he would rather

assign an engineer from India to aftertreatment projects.  Id. at 181-89.

Plaintiff contends his job was affected by the fact that he was not introduced as Senior Project

Engineer-Aftertreatment Developer while on Bhargava's team.  Plaintiff claims that he did not

receive information or emails because others in Defendant's or Navistar's employ were unaware that

aftertreatment development fell within Plaintiff's scope of responsibilities.  Id. at 170-71.  In April

2011, Plaintiff completed a TPM [Total Performance Management] Goal Setting Document in which

he noted his dissatisfaction that he had not been introduced as a Senior Project Engineer-

Aftertreatment Developer and that he was not leading any aftertreatment projects.  Id. at 157-161.

Plaintiff states that Bhargava directed him to remove his claims, but Plaintiff disagreed since "I was

not satisfied that I didn't  participate in the aftertreatment projects, and I was not introduced as an

aftertreatment engineer.  And I was not satisfied that this project went to Indians."  Id. at 161.

6

Plaintiff further contends that he preferred to leave work early on Friday in order to travel

to his residence in Simpsonville, South Carolina for Shabbat.[2]  Plaintiff states that he told Coghill,

Singh, and Kumar that he preferred to observe Shabbat by refraining from working from sundown

Friday to sundown Saturday.  Id. at 200.  According to Plaintiff, Bhargava scheduled a team meeting

around 6:30 p.m. or 7:00 p.m. one Friday.  Plaintiff told Bhargava that he had a religious obligation,

and that he could not stay.  According to Plaintiff, Bhargava told him, "You should do here the work

when I tell you."  Id. at 211-12.  Plaintiff also contends that on another Friday afternoon, Bhargava

told Plaintiff they could discuss Plaintiff's being assigned to aftertreatment projects.  According to

Plaintiff, Bhargava knew "No, on late Friday, I could not stay, because I have to drive home to meet

the Shabbat.  Shabbat is the accommodation for Jewish people.  And to tell it here, that – even after

that, and after that next weeks, [Bhargava] still urged me to stay there on Fridays."  Id.  Plaintiff

further contends that he complained about Bhargava's directive to McGrady, who stated that she

would talk to Bhargava.  Id. at 213.

Bhargava states that shortly after Plaintiff arrived at Defendant's Columbia, South Carolina

facility he (Bhargava) began receiving complaints from other team members regarding Plaintiff's

behavior and communication style.  Decl. Of Sameer Bhargava ¶ 11, ECF No. 33-4.  Singh reported

that Plaintiff made little effort to learn Defendant's testing process and that he conveyed he was

superior to the technician on the job.  Id. ¶ 12.  Other members stated that Plaintiff made

condescending comments to them about their lack of knowledge or his superior knowledge.  Id. ¶

---

[2] Shabbat is the Jewish day of rest and seventh day of the week, on which Jews remember the traditional creation of the heavens and the earth in six days and the Exodus of the Hebrews, and look forward to a future Messianic Age. Shabbat observance entails refraining from work activities and engaging in restful activities to honor the day. See http://en.wikipedia.org/wiki/Shabbat (September 12, 2013).

13. Bhargava states that he heard Plaintiff make negative comments to team members in meetings, including a remark that he (Plaintiff) should be leading the other engineers on the team because he had more experience and knew more than they did.  Id. ¶¶ 14-16.  Bhargava also states that Plaintiff challenged Bhargava in a team meeting, stating that he (Plaintiff) knew more than Bhargava.  Id. ¶ 17.  According to Bhargava, Plaintiff's comments negatively affected the team's collaborative process.  Id. ¶ 18.  Bhargava states that he attempted to counsel Plaintiff on April 13, 2011 regarding his conduct, but Plaintiff responded, "I have enough theoretical knowledge to work better and more efficiently than others.  I can challenge any one here with my skills."  Id. ¶ 20.  Bhargava further states that he received an email from Plaintiff regarding the TPM goals and work assignments that he viewed as defiant, untruthful, and conveying an unwillingness to cooperate with Bhargava and the other members of the Systems Optimization team.  Id. ¶ 21; see ECF No. 33-3, 2-4 (email string).

Bhargava reports that on April 18, 2011 he discussed with McGrady Plaintiff's "poor attitude about his work and the training he needed to perform it, that he was not a team player, and that his conduct was destroying my team's spirit."  Id. ¶ 22.  McGrady subsequently interviewed several members of the System Optimization team and consulted with her supervisor as well as Bhargava's supervisor.  A decision was made on April 19, 2011 to terminate Plaintiff.  Id. ¶ 23.

Plaintiff states that he was told in a meeting with Bhargava and McGrady that he was terminated because he did not follow instructions.  Depo. Of Joseph Kirzhner 217. Plaintiff was in shock.  Id. at 218.  Plaintiff was escorted from the premises.

Plaintiff denies making statements that he was more knowledgeable than the other team members or stating to Bhargava that he knew more about technologies than Bhargava.  Id. at 220-21. Plaintiff asserts that Bhargava discriminated against him "because of being not Indian and not Hindu

follower, but being Jewish from Ukraine, and not being naturally born U.S. citizen." Objections to

Report and Recommendation 13, ECF No. 49. Plaintiff believes he was terminated in retaliation for

complaining to Bhargava and McGrady regarding the project assignments and regarding Bhargava's

refusing to allow Plaintiff to return to Simpsonville Carolina by sunset on Friday. Id. at 213.

Plaintiff states that six out of seven engineers under Bhargava's supervision during Plaintiff's

employ are Indian and Hindu followers. Plaintiff further states that his job responsibilities were

assumed by Rama Nandiraju, an engineer also of Indian descent. Id.

Plaintiff further avers that he received his first paycheck along with a separate check for the

$15,000.00 relocation allowance shortly after March 31, 2011. Affidavit of Joseph Kirzhner ¶ 5,

ECF No. 35-3. Plaintiff states that on or about April 22, 2011, after his discharge, he learned that

Defendant had stopped payment on the relocation allowance previously provided to him. Id.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity

Commission. A Notice of Right to Sue was issued on June 18, 2012.

### DISCUSSION

### I. Federal Claims

A.    Title VII Law Generally

1.    Failure to Provide Religious Accommodation. Pursuant to Title VII, it is unlawful

for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). Religion is defined,

for Title VII purposes, as "all aspects of religious observance and practice, as well as belief, unless

an employer demonstrates that he is unable to reasonably accommodate to an employee's or

prospective employee's religious observance or practice without undue hardship on the conduct of

the employer's business." Id. § 2000e(j). Thus, an employer has a "statutory obligation to make

reasonable accommodation for the religious observances of its employees, short of incurring an

undue hardship." EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir.

2008)(quoting Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977)).

To prevail, a plaintiff must first establish a prima facie claim by showing that "'(1) he or she

has a bona fide religious belief that conflicts with an employment requirement; (2) he or she

informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with

the conflicting employment requirement.'" Id. (quoting Chalmers v. Tulon Co. of Richmond, 101

F.3d 1012, 1019 (4th Cir.1996)). When a plaintiff has established a prima facie case of religious

discrimination under Title VII, the burden of proof shifts to the employer to demonstrate either (1)

that it provided the plaintiff with a reasonable accommodation for his or her religious observances

or (2) that such accommodation was not provided because it would have caused an undue

hardship–that is, it would have resulted in more than a de minimis cost to the employer. Id. at 313

(quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 67, (1986).

2.    Discrimination on Basis of Religion or National Origin. Title VII makes it "an

unlawful employment practice for an employer . . . to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff

pursuing a Title VII discrimination claim may either offer direct evidence of discrimination or, using

indirect evidence, may rely on the burden-shifting framework that was adopted by the Supreme Court

in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Atkins v. Holder, 2013 WL

2996448 *2 (4th Cir. June 18, 2013). Under the latter standard, the plaintiff bears the initial burden of establishing a prima facie case. Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981)). To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he was a member of a protected group; (2) he suffered an adverse employment action; (3) he was performing his job satisfactorily at the time of the adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. Id. (citing cases). Where a plaintiff makes a showing sufficient to support a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. (citing McDonnell Douglas, 411 U.S. at 802). If the employer produces a legitimate reason for the action, the burden once again shifts to the plaintiff to show that the employer's rationale is a pretext for discrimination. Id. (citing McDonnell-Douglas at 804-05). The plaintiff can prove pretext by showing that the defendant's "'explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination.'" Id. (quoting Mereish v. Walker, 359 F.3d 330, 336 (4th Cir.2004)).

       3.     Retaliation.    Title VII also prohibits retaliation by a private employer against an employee because he "has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in McDonnell Douglas. To establish a prima facie case of retaliation, a plaintiff must show (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action. Stokes v. Va. Dep't of Corrections, 512 F. App'x 281, 282 (4th Cir. 2013) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir.2010)).

If a plaintiff establishes his prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its actions.  See id. (citing McDonnell Douglas, 411 U.S. at 802–03).  Once the employer comes forward with such a reason, the burden reverts to the plaintiff to establish that the employer's nonretaliatory rationale is a pretext for intentional discrimination. See id. (citing Heiko v. Colombo Sav. Bank, 434 F.3d 249, 258 (4th Cir. 2006)).  This "final pretext inquiry merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff."  Id. (quoting Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010)).

B.      The Report and Recommendation

The Magistrate Judge first determined that Plaintiff had abandoned his claim of failure to make a religious accommodation, as he did not address this claim in his responses to Defendant's motion for summary judgment.

As to Plaintiff's causes of action for retaliation, the Magistrate Judge assumed that Plaintiff had engaged in protected activity when he purportedly complained to McGrady on March 28, 2011 about Bhargava's alleged failure to make a religious accommodation.  The Magistrate Judge further observed that Defendant had conceded an adverse employment action.  However, she found that the close temporal proximity between the protected activity and Plaintiff's discharge was sufficient to establish causation for purposes of Plaintiff's prima facie case.

With respect to Defendant's proffered non-retaliatory reason for its actions, the Magistrate Judge noted that Defendant contends Plaintiff was terminated because his allegedly poor, uncooperative attitude inhibited the other members of Bhargava's team.  The Magistrate Judge determined that Plaintiff has set forth no evidence that Defendant's proffered reason was a pretext

12

for retaliatory animus based on Plaintiff's complaint to McGrady, and Plaintiff therefore failed to meet his ultimate burden of showing intentional retaliation.

Regarding retaliation related to national origin discrimination, the Magistrate Judge found that Plaintiff has not shown he engaged in a protected activity related to his national origin. The Magistrate Judge further noted that Plaintiff pointed to no testimony or evidence showing that Bhargava discriminated against him or refused to assign him aftertreatment projects in retaliation for engaging in any purported protected activity. Thus, the Magistrate Judge concluded that Plaintiff had failed to make out a prima facie case of retaliation based on national origin.

The Magistrate Judge did not address any claims raised by Plaintiff that he was subjected to discrimination on account of his religion or national origin.

E.    Plaintiff's Objections

Plaintiff first reasserts his claim that Defendant failed to accommodate his desire to observe Shabbat. The court agrees with the Magistrate Judge that Plaintiff has abandoned this cause of action by failing to raise it in his responses to Defendant's motion for summary judgment. See Crosby v. Gastonia, 635 F.3d 634, 637 n.3 (4th Cir. 2011) (observing that allegations neither argued nor briefed at summary judgment stage are deemed abandoned)(citing Forrest Drive Assoc. v. Wal-Mart Stores, Inc., 72 F. Supp. 2d 576, 586 n.5 (M.D.N.C. 1999)).

Even if Plaintiff had addressed the religious accommodation claim in response to Defendant's motion for summary judgment, Plaintiff cannot make out a prima facie case. As an initial matter, Plaintiff's deposition testimony belies his contention that his desire to observe Shabbat conflicted with any requirement that he work on Friday evenings:

Q.    What is Holy Shabbat to you?

13

A.     To me means that I would like, if it's possible, to go and to meet at, you know, someplace where I can give some simple, modest prayer–and me and my wife and daughter.  If it's not possible, I just make that in my mind.

Q.     Where do you go and pray when you have this time?

A.     At home.

. . . .

Q.     How often is Shabbat in the Jewish religion?

A.     Every weekend. . . . Starting with–when sun just goes down.  It's after the sun goes down. . . . On Friday.

Q.     When does it end?

A.     When?  Sundown the next day.

. . . .

Q.     Is there anything, during that period . . . that you, as a practicing Jew, are supposed to do or refrain from doing?

A.     There are no – no urgent needs, then I need to spend this time praying and reading and with my family.  As a–I am not orthodox, then I consider enough to have it mention and to thinking about it and having time with my family, if it's possible.  If not, then I should just think about it.

Q.     And what would qualify as an urgent need that would excuse you from doing that?  . . . [U]rgent work need?

A.     Yes.

. . . .

Q.     All right.  So you didn't have an absolute religious obligation to not work between sundown Friday to sundown Saturday.  This was just your personal choice if it worked out for you; is that right?

A.     I do have obligations.  However, if I don't have other choice, then I take it as another choice and make it–just adapt it to that.

> Q.      And you would not consider yourself to be violating any of your religious beliefs if you made the conscious choice to work or do something else during that Shabbat period, correct?
>
> A.      If I have to, then I don't consider that this is a violation, no.

Depo. Of Joseph Kirzhner 191-96.

Assuming for purposes of summary judgment, however, that Plaintiff's desire to observe Shabbat did conflict with his work requirements, and that he informed Bhargava of his desire to leave early on Friday to allow him to return to Simpsonville before sundown, which Bhargava denies, there is no evidence that Plaintiff was disciplined for failing to comply with Bhargava's alleged requirement that Plaintiff remain at work on Friday evenings. Plaintiff's objection is without merit.

Plaintiff next realleges his claims of discrimination based on national origin and religion. Plaintiff contends that Bhargava showed discrimination because "Bhargava is from India and Hindu follower, and assembled the team with 6 Indian descendants, and/or Hindu followers (6 out of 7 engineers, for total proportion - 6/7 not including Mr. Bhargava himself, are from India, and Hindu followers)[.]" Plaintiff's Obj. To Magistrate Judge's Shiva Hodges Report and Recommendation 17. Plaintiff contends that Bhargava talked favorably of India as a country at lunch, and that he told employees in meeting that he preferred using Indian employees when dealing with Indian customers. Id.

The court concludes that any claim of religious or national original discrimination have been abandoned. As noted hereinabove, Plaintiff responded to Defendant's summary judgment motion only as to his allegations of unlawful retaliation. See Plaintiff's Mem. Resp. in Opp'n to Def.'s Mot. for Summ. J. 7-9.

15

Further, the record does not supporting a finding that Plaintiff suffered an adverse employment action because of his religion or national origin. An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment. James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (quoting Von Guten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001)). In this case, Plaintiff states that he was not introduced to Defendant's employees as Senior Project Engineer-Aftertreatment Developer, and he was denied opportunities to participate in aftertreatment projects.[3] Plaintiff also acknowledges, however, that Bhargava wished for him to work with Singh and Kumar for a period of time to become familiar with Defendant's systems, hardware, software, and current projects. Depo. of Joseph Kirzhner 81-82. Plaintiff further concedes that he had no previous experience testing a Navistar engine. Id. at 97-98. Plaintiff's self-serving belief that he was ready to start aftertreatment development immediately, id. at 94, does not convert Bhargava's request that Plaintiff train with Singh and Kumar into an adverse employment action. Plaintiff's objection is without merit.

Regarding retaliation based on complaints about religious accommodation, Plaintiff contends the Magistrate Judge erred in finding that Defendant established a legitimate, nonretaliatory reason for his termination. Plaintiff states that "all Defendant testimonies about Plaintiff deficiencies in cooperation with team, "poor attitude', etc. are collected after or on the day of Plaintiff termination." Plaintiff's Obj. To Magistrate Judge's Shiva Hodges Report and Recommendation 23. Plaintiff argues that Defendant's assertions, "which describe Plaintiff as a person, having heavy problems

---

[3] Plaintiff also contends for the first time in his objections that he suffered an adverse employment action in that he was terminated because of his religion and national origin. Plaintiff previously has alleged only that he was terminated in retaliation for complaining about the alleged discriminatory treatment. The court will not consider Plaintiff's new arguments at this stage of the litigation.

with engineering qualifications/experience, not properly communicating to the team, etc., are full of common excuses of employers against unlawfully terminated employees, and these assertions have been collected by Defendant only at the Plaintiff termination day, or after, and most of them prepared just for the court." Id. at 27. The court is not persuaded. Although a post hoc rationale can allow a factfinder to infer there is not a legitimate explanation for a defendant's decision, see e.g., EEOC v. Sears Roebuck and Co., 243 F.3d 846, 853 (4th Cir. 2001), the court notes that Defendant documented its reasons for terminating Plaintiff at the time of the event. Further, Defendant has not offered shifting explanations for its decision. See id. (observing that an employer's inconsistent explanations and different justifications can be probative of pretext). Plaintiff's objection is without merit. Defendant's motion for summary judgment is granted as to Plaintiff's federal causes of action.

## II.  State Law Claims

The Magistrate Judge recommended that Plaintiff's state law claims be denied. However, given that there is no settled law regarding whether Defendant possesses a contractual or statutory obligation to provide Plaintiff with the $15,000.00 relocation allowance contained in the offer letter, the court declines to exercise jurisdiction over Plaintiff's state law causes of action. See 28 U.S.C. § 1367(c) (a district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it has original jurisdiction). Plaintiff is informed that the period of limitations for his state law claims is "tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Id. § 1367(d).

<u>CONCLUSION</u>

For the reasons stated herein, Defendant's motion for summary judgment is **granted** as to

Plaintiff's federal claims.  The court declines to exercise jurisdiction over Plaintiff's state law claims,

and those claims are **dismissed**, without prejudice.

**IT IS SO ORDERED**.


/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

September 23, 2013.